Case number 25-98, Trevor Kitchen, appellant, v. Montley Rice, on behalf of the appellant, Trevor Kitchen. Good morning. Good morning, Your Honours. May it please the Court, Frank Amanat, from Montley Rice, on behalf of the appellant, Trevor Kitchen. This case turns on the Commission's duty to apply its own unambiguous whistleblower regulations as written. For three separate reasons, any one of which independently suffices for reversal, CFTC's failure to follow its own rules when denying Mr. Kitchen a whistleblower incentive award violates the APA and requires its final decisions to be set aside. First, the Commission's direct submission rule controls this case. The plain and unambiguous text of 17 CFR 165.2 I.1 is broad and conduct-focused, consistent with the whistleblower program's design, which is to incentivize sophisticated outsiders who spot patterns of misconduct before regulators do to submit quality tips regarding their suspicions. If a whistleblower's original information is sufficiently specific, credible, and timely to cause staff to commence an investigation, and if the ensuing covered actions are based in whole or in part on conduct the tip identified, then the whistleblower is entitled to a mandatory award. The administrative record here shows that Mr. Kitchen satisfied both elements. CFTC does not dispute that the information Kitchen submitted in 2011 and 2012 was original, or that it was of sufficient quality to prompt both CFTC and NFA to open an investigation and engage with Kitchen after his 2011 to 2012 submissions. That satisfies the texts and investigation requirement. Moreover, the 2014 FX settlements were based on the same collusive conduct Kitchen flagged to the agency years earlier, namely actions by the handful of banks that dominated the FX industry to abuse their market power by coordinating trading strategies and the size and direction of large trades for their own benefit. Kitchen reported collusive bank behavior that moved FX rates. He named specific banks, and he provided quantitative analyses to support his tip. That conduct nexus satisfies the texts broad in whole or in part on conduct language and requires an award. The final decisions improperly rewrote the plain text of 165.2 I-1 to demand something the rule doesn't require, that Mr. Kitchen's exact information drove the particular investigation that produced the covered actions. In doing so, the committee... With your theory, you're talking about the fact that they're being generalized allegations that there was some manipulation going on with respect to trading, perhaps with their timing, with the general scheme, that that should be sufficient, even though the Bloomberg article came out with a different mechanism, scheme, et cetera. That's correct, Your Honor, because the whistleblower program is designed to incentivize tips. Whistleblowers often don't have the complete picture of the mechanism of what's going on. What Congress wanted to incentivize when it passed the Dodd-Frank Act and created the whistleblower program was for people to come forward with suspicions as soon as they have them, not when they have the complete picture or they are able to present the full case on a platter to the agency. The idea is that they would submit their submissions to the agency, and the agency would then use its investigative resources to develop the full picture, which would result in an enforcement action. That's what happened here. Mr. Kitchen's tip was not generalized. It was very specific. It may be up to the recipient to determine whether or not that information bears fruit. I mean, because you first admitted that generalized claims, just to kind of be in line first, so to speak, you know, gets you the prize, even if that's not the information that actually is the scheme. Well, again, the plain text of the regulation is focused on conduct, not on information. And an interesting contrast is last year, this court decided the LISAC case, which was based on the IRS's whistleblower regulations. And the IRS's whistleblower regulations specifically discuss a nexus between the information that was provided by the whistleblower and the action that was taken by the IRS. CFTC's whistleblower regulations are not written that way. They talk about whether the covered actions are based on conduct that is in whole or in part the same as the conduct that the whistleblower reported. And here, that conduct nexus is clear because, again, Mr. Kitchen reported that it wasn't generalized allegations. He had specific allegations of specific banks provided volatility analyses showing how the banks were conspiring with each other and colluding with each other to rig the FX markets to their own advantage. Now, he didn't have the mechanism entirely right. It would never have occurred to him that they were using secret chat rooms to coordinate these trading strategies. Let's frame this against what CFTC said. They essentially treated his submissions as raising one kind of specific information, specific information about misconduct by a WANDA. They investigated that and they closed the investigation. And then what the CFTC says is that specific information is not the conduct on which the successful action was based. The successful action was based on a different type of information. So what's wrong about that mode of analysis? Because it looks at the conduct nexus at the wrong level of generality. The regulation says, talks about conduct in whole or in part. That's a term of art which this court is familiar with. It's used in many settings where statutes and regulations try to So on the CFTC's reading, you would need to be able to show that the successful action was based in whole or in part on the specific conduct of the information about a WANDA that was provided. Because there, yes. No, because Mr. Kitchen's original complaint and tip was not solely focused on a WANDA. It talked about a WANDA, certainly. But it also specifically mentioned how a WANDA was in collusion with its counterparties at the large banks. And he specifically identified JP Morgan and UBS, who are two of the respondents in the covered actions. He mentioned them as collusive counterparties. And the focus of his, although he did mention a WANDA, the gist of his tip was that the dominant market participants in the foreign currency market, who are the large banks, were colluding with one another with regard to the size and direction of trades to rig the rates to their own benefit to the detriment of other market participants. And that is exactly the conduct that ended up in the covered actions. And, you know, he identified, for example, specific trading pairs of U.S. dollars, pound sterling, Japanese yen. He identified specific trading pairs which were being manipulated. And those were the same trading pairs that the commission mentioned in its covered actions, but which were not actually described in the Bloomberg article, which discussed how these chat rooms were focused on rigging the rates for currency pairs that were less commonly traded. But the bottom line is that under- credible. And it actually sounds like your view of this appeal is you're just challenging the commission's factual determination that Mr. Kitchen's information about market manipulation generally was generalized as opposed to specific. No, I would disagree with that, Your Honor. First of all, the specific, credible, and timely, that's a standard that is used to assess the quality of the information. And if it was of sufficient quality to prompt an investigation, which is undisputed here, it passes that threshold. Then the next question is, okay, what does the conduct nexus look like? The nexus between the conduct that formed the basis of the covered action and the conduct that was reported by the whistleblower. And so it's not a factual determination as to whether the tip was generalized. It's an application of the straightforward plain text of the regulation, which describes how a whistleblower becomes eligible for a mandatory award. And the commission, by rewriting its own rule, which this court said in the Panhandle Eastern case and the environmental case, that agencies that fail to follow their own regulations violate the APA. That's what the commission did here. They imported the significantly contributed requirement from the existing investigations rule 165.2 I-2, which has no bearing on this case, and interpreted 165.2 I-1 contrary to its plain text and underlying policy. I see I'm out of time. I've reserved two minutes for a rebuttal, unless the court wants to hear from me on the derivative source argument. Thank you. Thank you. Ms. Berry. Good morning. May it please the court. Ragini Berry for the Respondent Commodity Futures Trading Commission. Petitioner is seeking a $147.5 million whistleblower award from the CFTC based on his generalized complaints of fraud in foreign currency exchange or forex markets. But the whistleblower program is not designed to reward any and every non-specific tip or that the whistleblower submits and instead requires both that the claimant provide specific, credible, and timely original information that caused the CFTC to investigate, and that the commission brought a successful enforcement action based on conduct reported in that original information. Petitioner has pointed to nothing in the record to establish that he met these requirements, and the CFTC therefore requests that the court affirm the commission's denial of petitioner's award. This morning, I'd like to cover a few points, the first of which is that the commission was—we are in agreement that there are factual determinations at issue only, no statutory determination. And so the commission's whistleblower determination should be reviewed to ensure that the commission engaged in reasoned decision making. The second is as to the point of original information. A petitioner is incorrectly focusing on the nature of his complaint or the gist of the complaint, but Rule 165.2i looks to the original information that was both sufficiently specific, credible, and timely to cause the CFTC to investigate and reported the conduct that the CFTC successfully prosecuted. Neither petitioner's complaints about Awanda's conduct nor his more general allegations about fraud in the Forex market meet this standard. So what is the standard? Do you think that there needs to be a showing that the enforcement action wouldn't have been brought absent the tip? There needs to be a causal connection between the specific information and the enforcement action? That's correct. There is a causal nexus written into the rule. The rule defines what— What words? For starters, the rule defines what led to the successful enforcement action. So in defining that there—or in defining led to the successful enforcement action, you already see that there's a causal connection between the information and the successful enforcement action. As noted, petitioner is focusing both on the gist of his complaint and the true nature of the complaint and is saying so long as the CFTC opened an investigation, any investigation, if he included in the gist of his complaint anything that overlaps with the actions that the CFTC brought, then— Can I ask about—so here's a hypo. Yes. Mr. Kitchen gives extremely detailed, specific information about the exact thing that ends up in an enforcement action, but he sent it to Office A, which looked at it and didn't open an investigation and closed it. Office B, completely independently, investigates the same subject and recovers a billion dollars. Does he satisfy what's in the regulation? Well, that question was not before the commission, but I don't think so because the— The question is like direct overlap. He did everything he could, but there is, in fact, no causal connection between his submission and the enforcement action. If he doesn't meet the—if there is no causal nexus, then no, he doesn't meet it. He may have met the first part of the rule, which is that the CFTC—I don't remember whether your hypothetical says the CFTC opened an investigation. Yeah. He may have met that, but if it did not prosecute based on his original information, then no, I don't think he satisfies the rule. But again, that is not—that question was not before the commission. So, your answer kind of depends on did he get it in the right hands, like the actual Office B people who were going to prosecute that specific information. Like if A doesn't tell B, he loses because B then goes off on their own and they find out about this information a different way. Perhaps, but if I may, that's not really how the offices work. Here, indeed, the record does show that his information was ultimately submitted to the benchmark investigation team, but they found it not useful. So, we—it was about different conduct. It was about Awanda's conduct. So, you've said that my hypo isn't our case, and we do try to decide cases narrowly. So, what is your—what is the narrowest way of ruling for the CFTC that you would ask us to consider? The narrow—the second part of the rule, Rule 165, requires that the CFTC brought an action based on the original information reported by the claimant, and that original information is limited to the specific, credible, and timely information that caused an investigation, that caused the CFTC to open an investigation. Here, nothing in the record shows, including the cases themselves, that the CFTC prosecuted the conduct that the petitioner complained of or provided in his original information with specificity. The covered— Today, the petitioner is arguing that, well, he was specific because, you know, he's talking about manipulation of the foreign exchange markets, and Bridget found sterling and the dollar specifically, and he mentions a couple of these banks. Why isn't that sufficiently specific? Well, that's not specific enough, first, because it's talking about, at least perceived by the CFTC, reasonably perceived by the CFTC, a different market or a different part of the agency's jurisdiction. The agency has jurisdiction over benchmark rates, manipulation, and therefore prosecuted the manipulation of the benchmark rates. What he complained about was his retail transactions—pricing of retail transactions with Owanda. CFTC does not have jurisdiction over spot forex transactions. What it can do is prosecute an FCM's misconduct insofar as it involves unfair business dealings. And so that is the way, according to the declaration from the investigative team, that is the way that the CFTC read his complaint. So you have a difference in jurisdiction. You have a difference in the actual specifics of the complaint. He alleged that he was losing money—I mean, the title of his complaint was, Owanda Complaint About Market Abuse and Manipulation. Total market abuse and manipulation by one of your members, Owanda. Owanda moved the market lower and lower. Owanda and its counterparts—and this is where he brings up the counterparts, some of whom the CFTC prosecuted—have colluded to destroy sterling in the U.S. dollar. But none of that matched anything that the Bloomberg article reported in terms of the  So we have a difference in the jurisdiction. We have a difference in the facts and the scheme. And then we have a lack of specificity as to the involvement of the counterparts. What's your position on the standard with respect to whether or not substantial evidence in the case? The parties agree that the whistleblower determinations should be grounded in the factual record, and it should be a rational connection between the facts found and the decision. And we recognize that some courts view the question of substantial evidence as falling within an arbitrary and capricious review. And because this appeal challenges the commission's fact-finding, there may be no difference between the two here. But we did note that the SEC actually has a substantial evidence standard in its statute at Section 78Y, and the CFTC does not. Regardless, we submit that the record evidence amply supports the commission's determinations here. I'd like to just add one brief note on Petitioner's derivative source arguments. He makes two arguments on appeal here. He waived one of those by failing to raise it before the commission. And that is an argument that the commission must have looked at three articles, not just the one Bloomberg article. And that must have prompted the CFTC to open the investigation. Not only is that not supported by the record, but the commission had no occasion to consider that. So we ask that the court find that that argument was waived. The original Bloomberg derivative source argument lacks merit because there's nothing in the record that suggests that the petitioner was actually a source for that article. One-sided e-mail communications to somebody at Bloomberg who was not an author, those did not provide any detailed information about the conduct that the CFTC did ultimately prosecute. And one other specific question, but do you know if so there were declarations from at least two folks, were those disclosed to Mr. Kitchen along with the preliminary decision or only with the final decision? I believe he sought a review of the record and was able to view those before the preliminary determination, before the final decision. Yes. For the final decision. Yes. I actually, I do have a timeline here that I came up with.  But he would have had enough information to make the argument to the commission, and he didn't. To be clear, you also did not rely on our deference. There's no issue, no statutory determination issue here. Unless the court has any other questions, we respectfully request that the commission's decisions be affirmed for the reasons stated today and those in our briefs. Thank you. Why don't you take two minutes, Mr. Amanat. Thank you. Let me first address the derivative source arguments. First of all, the notion that the derivative source argument with regard to the IB Times UK article and the second Bloomberg article is forfeited or waived is completely meritless. That argument was raised repeatedly before the commission multiple times. Those articles were submitted as early as 2016 with the TCR supplement and was specifically argued in response to the preliminary decision, preliminary determination that the derivative source argument could draw from both the Bloomberg article as well as the IB Times UK article. To answer your question, Judge Garcia, those declarations that are in the record were only issued after the final decision. They were not issued with the preliminary determination. The commission's premise that even on the commission's premise that the June 12th Bloomberg story sparked this inquiry, Mr. Kitchen qualifies it under the derivative source rule. The final decision's principal rationale for deciding otherwise, the article didn't use the word whistleblower, is an on sequitur which the commission hasn't even defended on appeal confirming its arbitrariness and the record shows that Mr. Kitchen engaged specifically with the Bloomberg staff as early as 2011. The fact that the commission's final decisions didn't even mention the IB Times article or discuss it, discuss its provenance in connection with a derivative source argument is itself an indicium of arbitrariness and capriciousness because the agency failed to consider an important part of the problem. I see I'm out of time, so I would ask that the commission reverse, sorry, that the court reverse the commission's final decisions and remand for instruction of payment of the award. Thank you for your time, your honors.
judges: Henderson; Childs; Garcia